ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of -                                    )
                                               )
Trident Engineering & Procurement, P.C.        )    ASBCA Nos. 60541, 62144
                                               )
Under Contract No. W52P1J1-14-D-0037           )

APPEARANCES FOR THE APPELLANT:        Michael E. Barnicle, Esq.
                                        Arnold & Porter
                                        Chicago, IL

                                      Keith J. Feigenbaum, Esq.
                                        Arnold & Porter Kaye Scholer LLP
                                        Washington, DC

APPEARANCES FOR THE GOVERNMENT:       Scott N. Flesch, Esq.
                                        Army Chief Trial Attorney
                                      CPT Jules L. Szanton, JA
                                      Dana J. Chase, Esq.
                                      CPT Camille J Grathwohl, JA
                                        Trial Attorneys


OPINION BY ADMINISTRATIVE JUDGE THRASHER ON THE
GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT AND APPELLANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT

       This dispute involves a contract for Trident Engineering & Procurement, P.C.
(Trident) to provide the U.S. Army Contracting Command - Rock Island (government)
a 12-month leases of non-tactical vehicles in Qatar, Camp As Sayliyah.  Relevant to
these appeals, in addition to providing non-tactical leased vehicles, Trident was to
maintain the vehicles and invoice for traffic violations and tolls.  In December 2015,
Trident's representative, without authorization, retrieved the leased vehicles under the
contract and permanently transferred them to a third party.  As a result, the
government terminated the contract for default, and the contracting officer issued a
negative Contractor Performance Assessment Reporting System (CPARS) rating.

       The government moved for summary judgment, and Trident moved for
cross-summary judgment.  We grant the government's motion for summary judgment
in part and deny it in part.  We deny Trident's cross-motion for summary judgment.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

*Base Contract and Task Orders 0006-0008*

1. The U.S. Army Contracting Command - Rock Island awarded an indefinite delivery indefinite quantity, firm fixed price contract W52P1J-14-D-0037 (contract) for Non-Tactical Vehicle leasing services at various camps in Qatar, Jordan, and the United Arab Emirates (UAE) to Trident Engineering and Procurement P.C. (Trident, appellant) (R4, tab 1 at 000003). Trident was to provide all equipment, tools, materials, supervision, and other items and non-personal services necessary to maintain the vehicular leasing and maintenance requirements. The vehicle leases would be established on a 12-month cycle. (*Id.*)

2. The contract period of performance was for one base year (February 3, 2014 – February 2, 2015) with two 1-year option periods (R4, tab 1 at 000003).

3. At issue in this appeal are the government's leases for five non-tactical vehicles and the claimed costs for "traffic violations and tolls," described below in Task Orders 0006-0008.

4. Task Order 0006 was issued on July 6, 2015, for a 12-month lease of non-tactical vehicles in Qatar. Trident was to deliver to the government two full-sized SUVs. A separate contract line item number (CLIN) 0012AA for "traffic violations/tolls" was established in the amount of $2,376.00. (Gov't mot., ex. G-5 at 00000037; app. reply to gov't resp. to app's statement of undisputed material facts dtd.[1] April 15, 2022, ¶¶ 1-2).[2]

---

[1] In response to the government's motion for summary judgment, appellant submitted a "Statement of Genuine Issues of Material Fact" in its reply brief dated April 15, 2022, which corresponds to the numbered paragraphs in the government's Statement of Undisputed Material Facts alleged in its motion. Relevant paragraphs are noted herein. Appellant's statement will be cited as (app. statement of genuine issues of material fact).

[2] Both parties move for summary judgment and assert no disputed material facts regarding their respective legal positions, but they interpret the contract and events differently. "Merely because a party has moved for summary judgment and avers there are no genuine issues of fact precluding its recovery does not mean that it 'concede[s] that no issues remain in the event [that its] adversary's theory is adopted.'" We evaluate each cross-motion "separately on its merits, and all reasonable inferences are drawn in favor of the defending party; the Board is not bound to 'grant judgment as a matter of law for one side or the other.'" *United Healthcare Partners, Inc.*, ASBCA No. 58123, 16-1 BCA ¶ 36,374 at 177,113; *Osborne Constr. Co.*, ASBCA No. 55030, 09-1 BCA

5.  Similar to Task Order 0006, Task Orders 0007 and 0008 were issued on July 6, 2015, and September 13, 2015, for 12-month leases of non-tactical vehicles in Qatar.  Trident was to deliver a mid-size SUV and a crew-cab pickup (4x4) under Task Order 0007 and deliver a full-size SUV under Task Order 0008 (gov't mot., ex. G-5 at 00000041, 00000043, 00000047, 00000049; app. reply to gov't resp. to app's statement of undisputed material facts dtd. April 15, 2022, ¶¶ 12-14).  Task Orders 0007 and 0008 established a separate CLIN 0012AA for "Traffic Violations/Tolls" in the amount of $2,359.20 and $1,326, respectively (gov't mot., ex. G-5 at 00000045, 00000049).

6.  On November 14, 2015, Mr. Tony Kuster (Vice President of Operations, Trident) responded to the contracting officer's representative (COR) email of the same day that Mr. Hany Mostafa[3] is Trident's representative in Qatar and that Mr. Mostafa will coordinate vehicles to be removed off-base for repairs and maintenance (R4, tab 14 at 000167-68).

7.  On November 26, 2015, the COR emailed Mr. Kuster that Mr. Mostafa documented vehicle damage on a vehicle inspection report.  Mr. Kuster responded the same day that Trident would request an equitable adjustment if Mr. Mostafa indicated the damage on the sign-off sheet.  (R4, tab 43 at 000301-02)

8.  On December 20, 2015, the COR sent an email to the contracting officer (CO), Ms. Keller, informing her that he had received text messages from Mr. Mohammed Alajmi claiming to be a partner of Trident, who asserted he had not received payment for the vehicles leased in the government's possession for the Qatar Task Orders 0006-0008 and that he wanted the vehicles back (Rule 4, tab 13 at 000135; app. statement of genuine issues of material fact, ¶ 15; app. reply to gov't resp. to app's statement of undisputed material facts dtd. April 15, 2022, ¶ 15).

9.  On December 21, 2015, Mr. Alajmi forwarded an email exchange between him and Mr. John Zvarick (Executive Vice-President of Trident) to the COR (R4, tab 16).  In the forwarded email, Mr. Zvarick stated to Mr. Alajmi that Trident was losing "hundreds of thousands of dollars" with its Army vehicle leasing contract, which Trident was "ending," but that he was willing to negotiate a settlement with Trident's

---

¶ 34,083 at 168,513 (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

[3] The parties have cited various spellings of Mr. Hany Mohamed Mostafa.  Therefore, the Board will use the spelling provided in the Camp As Sayliyah Personnel Security Questionnaire and the screening Badge Request:  Mostafa (R4, tab 10 at 000107; tab 63).  However, if the Board quotes a document, it will employ the spelling of Mr. Mostafa from that document.

business partners for the past due payments for the leased vehicles. But he also stated that if Mr. Alajmi retrieves the leased vehicles in Kuwait, Mr. Zvarick will "walk away" from the Qatar contract. Additionally, Mr. Zvarick suggested settling Trident's past due debts, noting that Mr. Alajmi, as the vehicles' registrant and Trident's "full power of attorney," could retrieve the leased vehicles and sell them. Also, Mr. Zvarick reminded him that "I have given you full power of attorney . . . . All the cars that remain are in your name so what you do with them is between Al Manar and you. My advice is to sell them and to give Al Manar all the money to settle as much of the debt as possible." Finally, Mr. Zvarick stated that if Mr. Alajmi did not renew the vehicles' licenses, he would not send him any more money, and it would be up to Mr. Alajmi to solve the past due payments. (*Id*. at 000170-71)

10. On December 22, 2015, the CO emailed Mr. Zvarick and Mr. Tony Kuster (Vice President of Operations, Trident), informing them that the COR was contacted by Mr. Alajmi, who alleged he was a partner of Trident, and the registered owner of the leased vehicles under the contract, but has not received payment. The CO informed Trident that the government could not prohibit the vehicles' owner and registrant from picking up the leased vehicles. Additionally, the CO stated if Mr. Alajmi picked up the leased vehicles before the end of the task order and Trident failed to provide replacement vehicles, Trident would be in default. (Rule 4, tab 15 at 000145-46; app. statement of genuine issues of material fact, ¶¶ 16-18)

11. The same morning Mr. Zvarick responded to Ms. Keller, stating that Trident is looking into the issue "to insure there is no interruption of service" (R4, tab 15 at 000145) (app. statement of genuine issues of material fact, ¶ 19).

12. Mr. Kuster responded to Ms. Keller the next day, December 23, 2015, stating that the leased vehicles were registered to Mr. Alajmi. Still, Trident failed to take any measures to provide replacement vehicles if Mr. Alajmi retrieved them, writing, in part:

> We would like to acknowledge that Mr. Alajmi is not a partner of Trident, but rather a sponsor of Trident E&P Inc in Kuwait.
>
> That being said, he is correct in that he registered our vehicles under his name in Qatar. While it is incorrect that he is not being paid for any "services" he provides, Trident has taken measures to provide replacement vehicles in the event he continues on this path.
>
> We are working diligently to resolve this dispute with Mr. Alajmi, however Trident is prepared to give adequate

> notice to the COR in the event it becomes necessary to
> replace the vehicles.
>
> . . .
>
> Please rest assured that Trident will continue to provide
> uninterrupted service in support of this contract.
>
> . . .
>
> We are available . . . myself in Kuwait and John in PA.

(R4, tab 18 at 00018; app. statement of genuine issues of material fact, ¶¶ 20-21; (app. reply to gov't resp. to app's statement of undisputed material facts dtd. April 15, 2022, ¶ 19)

13. The same morning, the CO sent an internal email to the contract specialist and other government members informing them that Trident had stated "they have a plan in place to provide replacement vehicles" if Mr. Alajmi retrieved them from the government (R4, tab 17 at 000151-52; app. statement of genuine issues of material fact, at 9, ¶ 22; app. reply to gov't resp. to app's statement of undisputed material facts dtd. April 15, 2022, ¶ 20).[4]

14. On December 24, 2015, the COR emailed the CO informing her that Mr. Alajmi wanted the vehicles back and was attempting to coordinate a pickup from the government on December 28, 2015 (Rule 4, tab 17 at 000151; app. statement of genuine issues of material fact, ¶ 24).

15. The contract specialist emailed the CO on the morning of December 28, 2015, that Mr. Alajmi had texted him and was waiting for an email response from the CO before picking up the leased vehicles, "Mr. Alajimi [sic] has not picked up the vehicles yet. He did send me a text stating that he sent Katie [the CO Ms. Keller] an email and was waiting for her responds [sic] prior to picking up the vehicles" (R4, tab 21 at 000194; app. statement of genuine issues of material fact, at 10, ¶ 25).

---

[4] Appellant does not dispute the contents of the CO's email dated December 23, 2015, and the CO's declaration. However, appellant disputes "that the [g]overnment's actions constituted a review of Mr. Alajmi's claims. The Government failed to vet Mr. Alajmi's claims to the vehicles and accepted Mr. Alajmi's claims at face value after a perfunctory email to Trident." (App. reply to gov't resp. to app's statement of undisputed material facts dtd. April 15, 2022, ¶ 20)

16. The same morning, the CO responded, stating that she had received an email from Mr. Alajmi. Still, she could not provide any information or assistance to him as the government does not have privity of contract with Mr. Alajmi (R4, tab 21 at 000194; app. statement of genuine issues of material fact, ¶ 25).

17. That evening, the contract specialist emailed the CO and ACC-RI support staff to ask if Mr. Alajmi had picked up the vehicles and whether Trident had provided replacement vehicles (R4, tab 21 at 000195).

18. On December 30, 2015, 1600 Qatar time, Mr. Hany Mostafa, Trident's representative and designated vehicle representative in Qatar, retrieved five leased vehicles under Trident's active task orders T0006, T0007, and T0008 at Camp As Sayliyah (R4, tab 10 at 1; tab 14 at 000167; tab 23 at 00213; tab 25; tab 37 at 000279; tab 63; gov't mot. at 1, 8; app. statement of genuine issues of material fact, ¶ 32). Vehicle inspection sheets were completed and signed by both the COR and Mr. Mostafa[5] (R4, tabs 22, 62; gov't mot., ex. G-5 at 00000081; app. statement of genuine issues of material fact, ¶ 26).

19. The State of Qatar Vehicle Registration cards for the vehicles that Mr. Mostafa picked up on December 30, 2015, shows all the vehicles were registered to and owner[ed] by Mr. Mohammad Abudullah M. D. Alajmi[6] (R4, tab 62; app. statement of genuine issues of material fact, ¶ 33). Appellant does not object to the vehicle identification information or that the vehicles were registered to Mr. Alajmi but does object that Mr. Alajmi was the vehicles' owner.

20. The CO issued a cure notice under task orders 0006, 0007, and 0008 on January 6, 2016, for the leased vehicles and maintenance in Qatar. The CO explained that five leased vehicles were retrieved by Trident on December 30, 2015 and had yet to be replaced. The CO provided Trident 10 days to cure its deficiency, after which the government would terminate its contract for cause pursuant to Federal Acquisition

---

[5] (1) vehicle #635181, VIN #1FMJU1H54CEF25113, Ford Expedition; (2) vehicle #647729, VIN #1FMJU1H52CEF25093, Fort Expedition; (3) Vehicle #635176, VIN #1GNKR8ED4CJ281962, Chevy Traverse; (4) vehicle #282918, VIN #1GC1K9CG4BF165853, Chevy Silverado; and (5) vehicle # 635182, VIN #1FMJU1H59CEF13295, Ford Expedition.

[6] (1) vehicle #647729, VIN #1FMJU1H52CEF25093 registered on November 26, 2015; (2) vehicle #282918, VIN #1GC1K9CG4BF165853 registered on December 14, 2015; (3) vehicle #635176, VIN #1GNKR8ED4CJ281962 registered on November 25, 2015; (4) vehicle #635181, VIN #1FMJU1H54CEF25113 registered on December 1, 2015; and (5) vehicle #635182, VIN #1FMJU1H59CEF13295 registered on December 13, 2015.

Regulation (FAR) 52.212-4(m), COMMERCIAL ITEMS, TERMINATION FOR CAUSE. (R4, tab 25; app. statement of genuine issues of material fact, ¶ 36)

21. Mr. Zvarick sent an email to Mr. Alajmi on January 7, 2016, telling him to either return the vehicles or sell them as soon as possible:

> I am shocked that you pulled the cars off the base. Unless you put these cars back on base immediately Mohammed, then I have no choice but to end any further interaction with you or to commit any further funds.
>
> If this is your choice, and you certainly can decide to do that, then I would suggest that you make every effort to sell the vehicles as soon as possible.

(Gov't mot., ex. G-5 at 00000076; app. statement of genuine issues of material fact, ¶ 37)

22. In response to the cure notice, Mr. Kuster stated via email to the CO on the morning of January 20, 2016, that "I think we have sorted out any problems" and he will be responding in more detail later that day regarding Trident's current contract status and its "predicament" (R4, tab 23 at 000169).

23. Later that evening, Mr. Kuster sent a follow-up email to the CO stating that "Trident is unable to provide vehicles . . . . Please consider this our negative response" (R4, tab 23 at 000169-70).

24. The next day, January 21, 2016, the CO issued a Notice of Termination for Cause for the vehicle lease and maintenance services since Trident failed to timely address the cure notice dated January 6, 2016, and to provide replacement vehicles (R4, tab 32; tab 33 at 000248; app. reply to gov't resp. to app's statement of undisputed material facts dtd. April 15, 2022, ¶ 25).

25. The CO issued three separate modifications for Task Orders 0006, 0007, and 0008, on January 28, 2016, to terminate the task orders for cause in accordance with FAR clause 52.212-4(m) (R4, tab 34 at 000253, 000260, 000266). Under the narrative section, the CO explained that Trident picked up the leased vehicles on December 30, 2015, and that "Trident is authorized to invoice for approved services under this task order during this period of performance ONLY. Trident shall not invoice for services after 30 December 2015" (R4, tab 34 at 000255, 000261, 000267).

*Contractor Performance Assessment Report (CPAR)*

26. The CO issued a CPAR dated April 12, 2016, for performance being assessed from February 3, 2015 – January 21, 2016, the first option year:

| Evaluation Areas | Past rating | Rating |
|---|---|---|
| Quality: | Satisfactory | Satisfactory |
| Schedule: | Marginal | Unsatisfactory |
| Management: | Satisfactory | Unsatisfactory |
| Regulatory Compliance: | Satisfactory | Unsatisfactory |

(R4, tab 37 at 000278)

27. The CO provided detailed rating explanations for each evaluation area. The CO outlined several of Trident's deficiencies directed at lack of compliance with contract terms, failure to provide required documentation under the PWS, poor communication, poor management, and failure to provide uninterrupted service. Briefly, under the "schedule" evaluation, the CO explained that Trident failed to provide uninterrupted service, did not timely respond to the January 6, 2016, cure notice, and failed to take any actions or provide corrective action to the cure notice. Under the "management" evaluation, the CO outlined several issues related to Trident's failure to submit invoices in accordance with the conditions of the contract, failed to correct invoicing issues, and long periods in which the government could not get in touch with Trident. In addition, the CO described poor management of its employees, resulting in the removal of the vehicles from the base, which caused a break in service. Under the "regulatory compliance" section, the CO stated that Trident was issued a Level 1 Non-Conformance Report for failure to provide maintenance reports and failed to provide documentation as required in the PWS, such as proof of insurance. The CO noted that the government had sent multiple requests for this documentation to Trident. Finally, under the "additional/other" section, the CO described the events surrounding the vehicles being removed from the base on December 30, 2015, without replacement vehicles being provided and Trident's failure to timely respond to the CO's January 6, 2016, cure notice. (R4, tab 37 at 000279)

*Invoices and Invoice Processing*

28. The parties refer to invoice submissions and invoice payments through the Wide Area Workflow (WAWF), which shows Trident's invoice requests, supporting details, and the subsequent government processing actions of the invoice. However, we are unable to ascertain whether the "violations and tolls" CLIN were billed or included in the voice totals and whether invoices marked as "blocked for payment" by the payment official were paid. For example, Orders 006 – 008 utilize at least two CLINs for repayment of the leased vehicles (CLINs 002, 003) and a single CLIN for

8

traffic violations and tolls (CLIN 0012AA).  However, it is unclear whether invoices 1-20 demonstrate repayment for the (i) leased vehicles and (ii) traffic violations and tolls.  For example, invoices 2, 4, and 5 are marked "blocked for payment" by the payment official.  The payment official marks some invoices under Task Orders 007 and 008 that the traffic violations and tolls were listed but not billed (invoices 6, 8-12, 14, 15).  Lastly, only invoices 16-20 are marked as "paid" by the payment official, but these invoices do not include the traffic violations and tolls CLIN, 0012AA, in the invoice total ("unit price" and "invoice amount" are listed as $0.00).  The following chart summarizes the 20 WAWF invoices with corresponding Rule 4 references (R4, tabs 39-42, 44-59):

| | Delievery Order | invoice number | shipment number | CLIN # | unit price | invoice amount | date invoiced | Product/Service ID | Payment Official comments | cite |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | T0006 | TQV0601B | TQVS607Z | 0002AB | $990.00 | $1,980.00 | 6/6/2016 | Full Size SUV (635181 & 635182) 9-Jul-2015 to 8-Aug-2015 | 6/20/2016: "Document was processed by the entitlement system" | R4, tab 39 |
| | | | | 0012AA | $412.01 | $412.01 | | Traffic Violations/Tolls 9-Jul-2015 to 8-Aug-2015 | | |
| 2 | T0006 | TQV0608A | TQVS614Z | 0012AA | $412.01 | $412.01 | 7/7/2016 | Traffic Violations/Tolls 22-Aug-2015 to 4-Sep-2015 (1500QR) Ford Expedition | 7/25/2016: "Invoice Blocked for payment" | R4, tab 40 |
| 3 | T0006 | TQV0609A | TQVS615Z | 0012AA | $412.01 | $412.01 | 7/7/2016 | Traffic Violations/Tolls 18-Sep-2015 to 25-Sep-2015 (1500QR) Ford Expedition | 7/25/2016: "Document was processed by the entitlement system" | R4, tab 41 |
| 4 | T0006 | TQV0610A | TQVS616Z | 0012AA | $412.01 | $412.01 | 7/7/2016 | Traffic Violations/Tolls 2-Oct-2015 (1500QR) Ford Expedition | 7/25/2016: "Invoice Blocked for payment" | R4, tab 42 |
| 5 | T0006 | TQV0611A | TQV0611A | 0012AA | $82.42 | $82.42 | 7/7/2016 | Traffic Violations/Tolls 9-Oct-2015 (300QR) Ford Expedition | 7/25/2016: "Invoice Blocked for payment" | R4, tab 44 |
| 6 | T0007 | TQV0701C | TQVS709Z | 0002AA | $965.00 | $965.00 | 6/24/2016 | Mid Size SUV (635176) 10-Jul-2015 to 9-Aug-2015 | 9/12/2016: "Please do not list clins that are not being billed on future invoices, this keeps the invoice from flowing into the pay system on its own. Clin 0012AA was listed but is not billed." | R4, tab 45 |
| | | | | 0003AF | $1,001.00 | $1,001.00 | | Crew Cab Pickup Truck 4X4 (282918) 10-Jul-2015 to 9-Aug-2015 | | |
| | | | | 0012AA | $0.00 | $0.00 | | Traffic Violations 10-Jul-2015 to 9-Aug-2015 | | |
| 7 | T0007 | TQV0702C | TQV0702C | 0002AA | $965.00 | $965.00 | 6/24/2016 | Mid Size SUV (635176) 10-Aug-15 to 9-Sep-15 | 9/12/2016: "Processed for payment" | R4, tab 46 |
| | | | | 0003AF | $1,001.00 | $1,001.00 | | Crew Cab Pickup Truck 4X4 (282918) 10-Aug-15 to 9-Sep-15 | | |
| | | | | 0012AA | $82.40 | $82.40 | | Traffic Violations 10-Aug-15 to 9-Sep-15 | | |
| 8 | T0007 | TQV0703B | TQVS711Z | 0002AA | $965.00 | $965.00 | 6/24/2016 | Mid Size SUV (635176) 10-Sep-15 to 9-Oct-15 | 9/12/2016: "Please do not list clins that are not being billed on future invoices, this keeps the invoice from flowing into the pay system on its own. Clin 0012AA was listed but is not billed." | R4, tab 47 |
| | | | | 0003AF | $1,001.00 | $1,001.00 | | Crew Cab Pickup Truck 4X4 (282918) 10-Sep-15 to 9-Oct-15 | | |
| | | | | 0012AA | $0.00 | $0.00 | | Traffic Violations 10-Sep-15 to 9-Oct-15 | | |
| 9 | T0007 | TQV0704B | TQVS712Z | 0002AA | $965.00 | $965.00 | 6/24/2016 | Mid Size SUV (635176) 10-Oct-15 to 9-Nov-15 | 9/12/2016: "Please do not list clins that are not being billed on | R4, tab 48 |

9

| # | | | | CLIN | | | Date | Description | Note | Ref |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | $1,001.00 | $1,001.00 | | Crew Cab Pickup Truck 4X4 (282918) 10-Oct-15 to 9-Nov-15 | future invoices, this keeps the invoice from flowing into the pay system on | |
| | | | | | $0.00 | $0.00 | | Traffic Violations 10-Oct-15 to 9-Nov-15 | its own. Clin 0012AA was listed but is not billed." | |
| 10 | T0007 | TQV0705B | TQVS713Z | 0002AA | $965.00 | $965.00 | 6/24/2016 | Mid Size SUV (635176) 10-Nov-15 to 9-Dec-15 | 9/12/2016: "Please do not list clins that are not being billed on | R4, tab 49 |
| | | | | 0003AF | $1,001.00 | $1,001.00 | | Crew Cab Pickup Truck 4X4 (282918) 10-Nov-15 to 9-Dec-15 | future invoices, this keeps the invoice from flowing into the pay system on | |
| | | | | 0012AA | $0.00 | $0.00 | | Traffic Violations 10-Nov-15 to 9-Dec-15 | its own. Clin 0012AA was listed but is not billed." | |
| 11 | T0007 | TQV0706C | TQVS714Z | 0002AA | $675.50 | $675.50 | 6/24/2016 | Mid Size SUV (635176) 10-Dec-2015 to 30-Dec-2015 | 9/12/2016: "Please do not list clins that are not being billed on | R4, tab 50 |
| | | | | 0003AF | $700.70 | $700.70 | | Crew Cab Pickup Truck 4X4 (282918) 10-Dec-2015 to 30-Dec-2015 | future invoices, this keeps the invoice from flowing into the pay system on | |
| | | | | 0012AA | $0.00 | $0.00 | | Traffic Violations 10-Dec-2015 to 30-Dec-2015 | its own. Clin 0012AA was listed but is not billed." | |
| 12 | T0008 | TQV0801B | TQVS807Z | 0002AB | $1,105.00 | $1,105.00 | 5/12/2016 | Full Size SUV (647729) 13-Sep-2015 to 12-Oct-2015 | 9/12/2016: "Please do not list clins that are not being billed on future invoices, this keeps the invoice from flowing into the pay system on its own. Clin 0012AA was listed but is not billed." | R4, tab 51 |
| | | | | 0012AA | $0.00 | $0.00 | | Traffic Violations/Tolls 13-Sep-2015 to 12-Oct-2015 | | |
| 13 | T0008 | TQV0802C | TQVS808Z | 0002AB | $1,105.00 | $1,105.00 | 6/20/2016 | Full Size SUV (647729) 13-Oct-2015 to 12-Nov-2015 | | R4, tab 52 |
| | | | | 0012AA | $274.72 | $274.72 | | Traffic Violations/Tolls 13-Oct-2015 to 12-Nov-2015 (Backup documentation attached) | 9/12/2016: "Processed for payment." | |
| 14 | T0008 | TQV0803B | TQVS809Z | 0002AB | $1,105.00 | $1,105.00 | 5/12/2016 | Full Size SUV (647729) 13-Nov-2015 to 12-Dec-2015 | 9/12/2016: "Please do not list clins that are not being billed on future invoices, this keeps the invoice from flowing into the pay system on its own. Clin 0012AA was listed but is not billed." | R4, tab 53 |
| | | | | 0012AA | $0.00 | $0.00 | | Traffic Violations/Tolls 13-Nov-2015 to 12-Dec-2015 | | |
| 15 | T0008 | TQV0804B | TQVS810Z | 0002AB | $663.00 | $663.00 | 6/20/2016 | Full Size SUV (647729) 13-Dec-2015 to 30-Dec-2015 | 9/12/2016: "Please do not list clins that are not being billed on future invoices, this keeps the invoice from flowing into the pay system on its own. Clin 0012AA was listed but is not billed." | R4, tab 54 |
| | | | | 0012AA | $0.00 | $0.00 | | Traffic Violations/Tolls 13-Dec-2015 to 30-Dec-2015 | | |
| 16 | T0006 | TQV0602A | TQVS602Z | 0002AB | $990.00 | $1,980.00 | 5/5/2016 | Ford Expedition, Full Size SUV (635181 & 635182) 9-Aug-2015 to 8-Sep-2015 | 5/13/2018: "Paid" | R4, tab 55 |
| | | | | 0012AA | $2,005.49 | $0.00 | | QatarNTVTrafficViolationandTolls | | |
| 17 | T0006 | TQV0603A | TQVS603Z | 0002AB | $990.00 | $1,980.00 | 5/5/2016 | Ford Expedition, Full Size SUV (635181 & 635182) 9-Sep-2015 to 8-Oct-2015 | 5/13/2018: "Paid" | R4, tab 56 |
| | | | | 0012AA | $2,005.49 | $0.00 | | QatarNTVTrafficViolationandTolls | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 18 | T0006 | TQV0604A | TQVS604Z | 0002AB | $990.00 | $1,980.00 | 5/5/2016 | Ford Expedition, Full Size SUV (635181 & 635182) 9-Oct-2015 to 8-Nov-2015 | 5/13/2018: "Paid" | R4, tab 57 |
| | | | | 0012AA | $2,005.49 | $0.00 | | QatarNTVTrafficViolationandTolls | | |
| 19 | T0006 | TQV0605A | TQVS605Z | 0002AB | $990.00 | $1,980.00 | 5/5/2016 | Ford Expedition, Full Size SUV (635181 & 635182) 9-Nov-2015 to 8-Dec-2015 | 5/13/2018: "Paid" | R4, tab 58 |
| | | | | 0012AA | $2,005.49 | $0.00 | | QatarNTVTrafficViolationandTolls | | |
| 20 | T0006 | TQV0606 | TQVS606Z | 0002AB | $726.00 | $1,452.00 | 5/5/2016 | Ford Expedition, Full Size SUV (635181 & 635182) 9-Dec-2015 to 30-Dec-2015 | 5/13/2018: "Paid" | R4, tab 59 |
| | | | | 0012AA | $2,005.49 | $0.00 | 5/5/2016 | QatarNTVTrafficViolationandTolls | | |

*Trident's March 31, 2019, Claim*

29. Trident filed a certified "Contract Claim for Damages due to Government Breach," dated March 1, 2019, demanding "$27,510.99 for services provided before the vehicle transfer, and $392,515.79 in damages resulting from the government's breaches" (a total of $420,026.78) (gov't mot., ex. G-2 at 9-11, 15; ex. 3; R4, tab 60 at 2)). In addition, Trident alleges that the "final CPAR" is "arbitrary and capricious" and requests revisions to accurately reflect Trident's performance (gov't mot., ex. G-2 at 13-14). Finally, Trident's claim requests that the termination for cause under Task Orders 0006-0008 should be converted to a termination for convenience as Trident's interrupted services were caused by the government's breach of unauthorized transfer of the leased vehicles to Mr. Alajmi (*id*. at 14).

*COFD dated May 16, 2019*

30. The CO issued a final decision on May 16, 2019, for Trident's March 1, 2019, claim (R4, tab 60). The CO determined that Trident's claim "lacks merit" and denied it in its entirety (R4, tab 60 at 000385).

*Katherine Keller Declaration*

31. Katherine Keller was assigned to ACC-RI and was the CO for the contract and testified by submittal of a sworn declaration. We find the declaration of CO Keller credible and not contradicted by any evidence of comparable weight.[7]

---

[7] *See Black Tiger Co.*, ASBCA No. 59819, 18-1 BCA ¶ 37,046 at 180,336 (Board found that the submitted declarations credible, "persuasive and of great weight [and] Appellant has offered no evidence or made any argument to rebut these declarations. . ."); *Smart Constr. & Eng'g Co.*, ASBCA No. 59354, 15-1 BCA ¶ 36,018 at 175,917 (The Board finding that the declaration was credible, supported by the record, and highly probative).

11

32.  CO Keller declared that Trident stated that Mr. Mostafa would be its representative and provided documents for the background check to obtain a base access badge to enter the base as Trident's representative.  In his role as Trident's representative, Mr. Mostafa provided quality assurance on the vehicles.  He addressed vehicle issues such as requiring repairs, registration, tire changes, and/or oil changes, being involved in accidents, and receiving traffic fines.  Mr. Mostafa would then work to resolve those issues on behalf of Trident.  In addition, the CO declared that Mr. Kuster informed the government that Mr. Mostafa had the authority to inspect vehicles, perform maintenance work on the vehicles, and pick up the vehicles from the government.  Thus, as Trident's representative, Mr. Mostafa handled all vehicle inspections, maintenance, and returns.  (Gov't reply, Katherine Keller decl. ¶¶ 2, 3)

33.  CO Keller declared that the government never initiated any communications with Mr. Alajmi.  After learning of his allegations against Trident, Ms. Keller informed the COR and support staff to cease all communications with Mr. Alajmi (gov't reply, Katherine Keller decl. ¶ 4).

34.  CO Keller declared that when the government first learned of Mr. Alajmi's dispute with Trident, it investigated and determined that the leased vehicles in the government's possession were registered to Mr. Alajmi (gov't reply, Katherine Keller decl. ¶ 5).

35.  Ms. Keller informed Trident of Mr. Alajmi's allegations.  Mr. Kuster confirmed the dispute, and Mr. Kuster "assured that Trident would provide replacement vehicles, if necessary, to ensure uninterrupted service in accordance with the Contract" (gov't reply, Katherine Keller decl. ¶ 6).

36.  CO Keller declared that Trident did not further communicate with the government  concerning its dispute with Mr. Alajmi.  As Trident's representative, Mr. Mostafa "was the individual the government would have expected to pick up the subject vehicles in the event that Trident's dispute with Mr. Aljami was not resolved and Trident intended to provide replacement vehicles to ensure uninterrupted services for the remainder of the performance period."  (Gov't reply, Katherine Keller decl. ¶ 7)

*Trident's Notice of Appeals, and Board's Notices of Docketing*

37.  Trident appealed the Termination for Cause on April 19, 2016, which was docketed as ASBCA No. 60541 on April 20, 2016, and later on August 12, 2019, Trident appealed the CO's May 16, 2019 decision denying the claim for damages, which was docketed as ASBCA No. 62144 on August 13, 2019.  Thereafter, the Board granted the parties' motion to consolidate the appeals on September 17, 2019.

12

*Relevant Contract Clauses and Performance Work Statement (PWS)*

38.  Included in the Contract's Special Contract Requirements section was the language:  "Sponsorship.  The Contractor shall obtain local sponsorship as required for all personnel for the purpose of providing in-country legal representation, work visas and resolution of other personal business or domestic matters, in compliance with host nation labor laws" (R4, tab 1 at 21).

39.  The contract states that services shall be performed in accordance with the Performance Work Statement (PWS) (R4, tab 1 at 3, 30).

40.  The contract incorporated by reference FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (JULY 2013), which reads in part:

> . . .

> (f)  Excusable delays.  The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers.  The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

> . . .

> (m)  Termination for cause.  The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance.  In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the

Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

(R4, tab 1 at 25); FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (JULY 2013)

41. The contract also contained the provision "1.0 GENERAL INFORMATION," which reads:

> Description of Services/Introduction: The contractor shall provide all equipment, tools, materials, supervision, and other items and non-personal services necessary to maintain the vehicular leasing and maintenance requirements as defined in this Performance Work Statement (PWS). The contractor shall perform to the standards listed in this contract.

(R4, tab 1 at 31)

42. Trident identified Tony Kuster and John Zvarick as Contract Managers. Trident did not designate any other Contract Managers internally, or identify any other Contract Managers to the CO or COR. The PWS provides:

> 1.12 Contract Manager:
>
> The Contractor shall provide a Contract Manager who shall be responsible for the performance of the work. The name of this person and an alternate who shall act for the contractor when the manager is absent shall be designated in writing to the contracting officer within 24hrs of contract award. The contract manager or alternate shall speak, read and write English and have full authority to act for the contractor on all contract matters relating to daily operation of this contract. The Manager shall be the central point of contact with the COR and Contracting Officer for performance of all work under the contract.
>
> 1.13 Personnel:
>
> 1.13.1 The contractor shall advise the COR immediately of any changes in personnel. "Immediately" for the purpose

14

of this notification shall mean: The beginning of the next regular business day.

(R4, tab 1 at 33)

*PERFORMANCE WORK STATEMENT (PWS)*

43. The Badging section states all contractor personnel who have access to U.S. military installations shall be cleared and badged and that "[t]he contractor will be responsible for control and accountability of personnel brought on to U.S. military installations" (R4, tab 1 at 32, PWS ¶¶ 1.8.6, 1.8.7).

44. PWS Part 4.0 describes the contractor-furnished property, equipment, and services:

> 4.1 The Contractor shall provide specified vehicles and all services required to keep the vehicles in a safe, operational manner.
>
> 4.2 The Contractor shall provide a list of those services based upon vehicles ordered per task order.
>
> 4.3 The contractor shall deliver vehicles within the timeframe agreed to in this contract and must meet the minimum acceptance criteria provided herein. If the Contracting Officer determines that any vehicle furnished is not in compliance with this contract, the Contracting Officer shall promptly inform the contractor. If the contractor fails to replace the vehicle or correct the defects as required by the Contracting Officer, the U.S. Government may:
>
> (a) Charge or off-set against the contractor any excess costs occasioned thereby
>
> (b) Terminate the contract under the Default clause of this contract. Failure to pass the acceptance inspection in the timeframe specified may result in consideration for a monetary penalty.

(R4, tab 1 at 36)

45. PWS ¶ 4.6 Joint Inspection reads:

15

The Contractor or the Contractor's Representative and the Contracting Officers Representative (COR) shall perform a joint inspection and shall document in writing the vehicle condition upon delivery and return of the vehicles. This will be the sole validating document used when returning the vehicles to the contractor. The following minimum criteria shall be met at the time of acceptance inspection. The Government shall accept or reject vehicles promptly after joint inspection. All assets under contract will be delivered to the Contracting Officer Representative or designated representative for an Acceptance Inspection. Any item delivered that does not meet the outlined requirements in this Statement of Work will be deemed "Rejected" and reported to the Contracting Officer in writing. This shall be annotated on the Acceptance Inspection sheet.

4.6.1 The Government will not be responsible for any damage or missing items not documented on the inspection checklist or for fair wear and tear. The Contractor and Government Contract Representative shall sign the inspection document. A joint inspection will be documented on a Transportation Department Leased Vehicle Inspection Check List. If the contractor fails to conduct a joint inspection or overlooks an item while conducting a joint inspection with a government representative the contractor will be held liable for all damage that was not identified at the time of inspection.

4.6.2 The vehicles that are modified will be according to the NTSB standards. Vehicles that are not with (sic) the standards shall be rejected. The vendor, at no cost to the government, shall replace unacceptable vehicles within 24 hours.

(R4, tab 1 at 36-37)

46. PWS ¶¶ 4.9, 5.3, and 5.13 describe that "the Contractor may replace the vehicle at any time with an equal or higher quality vehicle" unscheduled or scheduled service (R4, tab 1 at 39-41).

47. PWS ¶ 10.0 Liability and Insurance contains the following:

The U.S. Government shall not be responsible for loss of or damage to, leased vehicles resulting from (1) normal wear and tear, or (2) negligence of the Contractor, its agents, or employees. The Contractor shall be liable for, and shall indemnify and hold harmless the U.S. Government against, all actions or claims for loss of or damage to property or the injury or death of persons, resulting from the fault, negligence, or wrongful act or omission of the Contractor, its agents or employees. The Contractor shall provide and maintain insurance covering its liabilities in amounts that are in accordance with Host Nation Law for requirements concerning the amount liable per person, amount per occurrence for death or bodily injury, and amount for property damage or loss.

(R4, tab 1 at 43)

DECISION

I. Summary Judgement Standard of Review and The Parties' Positions

*A. Summary Judgment Standard of Review*

Summary judgment will be granted if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A material fact is one which may make a difference in the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine" dispute as to such a fact "if the evidence is such that a reasonable [fact-finder] could return a verdict for the nonmoving party" (*id.* at 242). Once the moving party has met its burden of establishing the absence of disputed material facts, then the non-moving party must set forth specific facts, not conclusory statements or bare assertions, to defeat the motion. *Pure Gold, Inc. v. Syntax (U.S.A.), Inc.*, 739 F.2d 624, 626-27 (Fed. Cir. 1984).

In evaluating the parties' contentions, we are guided by the familiar rule that "[t]he fact that both parties have moved for summary judgment does not mean that the [Board] must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

17

## B. The Parties' Positions

The government moves for summary judgment arguing that appellant fails to meet its burden to show that the government breached the contract for returning the vehicles to appellant's representative, breached the covenant of good faith and fair dealing, bailment, and its termination for cause was proper as Trident failed to address the CO's cure notice. Additionally, the government argues the CO's negative CPARS rating was accurate as Trident failed to provide leased vehicles as required by the contract and that it has reimbursed appellant for any services rendered prior to removal of the vehicles. (Gov't mot. at 1, 19-20)

Appellant requests that we deny the government's motion for summary judgment and, instead, grant summary judgment in its favor (app. cross-mot. and resp. at 1, 10-15).

We address the following seven issues: (1) breach of contract for failure to return the leased vehicles, (2) breach of contract for communicating with a third-party concerning contract performance, (3) breach of the implied duty of good faith and fair dealing, (4) breach of the bailment agreement, (5) failure to pay for services provided, (6) request to convert the termination for cause to a termination for convenience, and (7) the CO issuing an arbitrary and capricious CPARS rating.

## II. Discussion

### A. Appellant Did Not First Materially Breach the Contract By Not Having An Ownership Right in the Leased Vehicles

As the claimant, appellant bears the burden of proving an affirmative monetary claim against the government by a preponderance of the evidence. *M.A. Mortenson Co.*, ASBCA No. 53062 *et al.*, 01-2 BCA ¶ 31,573 at 155,906, and cases cited therein. Appellant must establish liability, causation, and resultant injury. *Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994) (en banc); *see also Wunderlich Contracting Co. v. United States*, 173 Ct. Cl. 180 (1965). The elements of a breach of contract claim are: (1) a valid contract between the parties; (2) an obligation or duty on the part of the government arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. *Lockheed Martin Integrated Sys., Inc.*, ASBCA Nos. 59508, 59509, 17-1 BCA ¶ 36,597 at 178,284 citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Military Aircraft Parts*, ASBCA No. 60009, 16-1 BCA ¶ 36,388 at 177,410; *Northrop Grumman Sys. Corp. Space Sys. Div.*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,237). To succeed, appellant must prove all four of the elements.

18

The government denies it breached the contract and asserts that appellant first materially breached the contract by not having an ownership right in the vehicles, which would excuse any subsequent breach by the government (gov't mot. at 30, 31). Specifically, the government argues that paragraph 1.0 of the PWS required Trident "to provide all 'equipment, tools, materials, supervision, and other items and non-personal services necessary to maintain the vehicular leasing and maintenance requirements as defined in [the] Performance Work Statement'" (id. at 30). The government points out that the vehicles were owned and registered to a third party, which appellant does not refute (gov't mot. at 30-31, n.3). In the government's reply, it shifts its argument that the contract required Trident to have an "ownership interest" in the leased vehicles to a "possessory interest" (gov't reply at 38-39). "A possessory interest is different from an ownership interest as a possessory interest 'includes the present right to control property, including the right to exclude others, by a person who is not necessarily the owner'" (id. at 39). Thus, the government argues that Trident failed to maintain a possessory interest in the leased vehicles when the vehicles were registered to a third party, failed to pay its lenders for the leased vehicles, and to avoid its mounting debts, provided Mr. Alajmi full power of attorney to re-sell the vehicles (id. at 39-40). Consequently, the government argues that appellant committed a prior material breach by providing vehicles it had no possessory interest in and thus could not maintain the leasing and maintenance requirements per the performance work statement (id. at 38-41). Trident argues that the contract was silent on ownership rights and that "[t]he contract only required Trident to 'furnish' or 'provide' the vehicles," terms which the contract did not define (app. cross-mot. and resp. at 11).

The Federal Circuit has described the doctrine of a first material breach as follows:

> [W]hen a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its nonperformance at the time of the alleged breach. Faced with two parties to a contract, each of whom claims breach by the other, courts will "often...impose liability on the party that committed the first material breach."

*Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1380 (Fed. Cir. 2004) (citations omitted); *see also Supreme Foodservice GmbH*, ASBCA No. 57884 *et al.*, 16-1 BCA ¶ 36,387 at 177,398-99; *Afghanistan Trade Transp. Co.*, ASBCA No. 59782, 15-1 BCA ¶ 36,077 at 176,165.

We turn to the contract and PWS. Contract interpretation is a question of law. *Barron Bancshares, Inc.*, 366 F.3d at 1368; *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed.Cir.1998)In interpreting a contract, we begin with the plain language of the contract. *See, e.g., Banknote Corp. of America, Inc. v. United States*,

19

365 F.3d 1345, 1353 (Fed. Cir. 2004). An additional canon of contract interpretation is that the contract should be read as a whole, harmonizing and giving meaning to all provisions. *ThinkQ, Inc.*, ASBCA No. 57732, 13 BCA ¶ 35,221 at 172,825 (citing *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)).

PWS clause 1.0 states that "The contractor shall *provide* all equipment, tools, materials . . . to maintain the vehicular leasing and maintenance requirements as defined in this Performance Work Statement" (SOF ¶ 41) (emphasis added). The PWS continues to use the terms "provide" or "furnish" when describing the contractor's responsibilities for the leased vehicles. (SOF ¶ 44). We agree with appellant that the contract required Trident to "provide" and "furnish" the vehicles, but the contract was silent on the ownership or possessory interest that was required (app. cross-mot. and resp. at 1).

Contract interpretation cases are subject to summary disposition where the contract language is unambiguous. *Muniz v. United States*, 972 F.2d 1304, 1309 (Fed. Cir. 1992); *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984). A contract provision is clear and unambiguous if only one reasonable interpretation exists. *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1544 (Fed. Cir. 1993). The contract is unambiguous that it required Trident to "supply or make available" the leased vehicles over the term of the contract by employing the terms "provide" and "furnish." The plain and unambiguous meaning of the written agreement will control. *Hercules Inc. v. United States*, 292 F.3d 1378, 1380-81 (Fed. Cir. 2002). Where the terms "provide" and "furnish" language is unambiguous and susceptible only to one reasonable meaning, the Board's review is limited to the plain meaning without considering extrinsic evidence. *Lebolo-Watts Constructors 01 JV, LLC*, ASBCA No. 59740 *et al.*, 21-1 BCA ¶ 37,789 at 183,433. We conclude that the contract did not require appellant to have an ownership interest in the leased vehicles. In addition, the government's possessory interest argument also falls short. The contract employs the terms "provide" and "furnish," not "possessory." Accordingly, as we hold that the contract did not require appellant to have an ownership interest in the leased vehicles, appellant did not first materially breach the contract.

### B. Breach of Contract (Communications Regarding Contract Performance)

*i. The government did not breach the contract for receiving communications from Mr. Alajmi, and appellant has failed to show that the government coordinated with Mr. Alajmi to retrieve the leased vehicles*

Appellant asserts "that the Government fell for a scam perpetrated by Mr. Alajmi—a con artist with no privity of contract and a fake Trident email address. The Government asked no questions of Mr. Alajmi, but turned over Trident's vehicles

to him to Trident's detriment" (app. cross-mot. and resp. at 10).  Trident argues that the government materially breached the contract by transferring the leased vehicles to a third party, Mr. Alajmi (*id*. at 11).  Trident asserts that once Mr. Alajmi informed the government that he intended to retrieve the leased vehicles on December 28, 2015, the government did not investigate his claims and did not fully communicate this information back to Trident (*id*. at 14-15).  Trident stated it was blindsided that the government allowed the leased vehicles to be retrieved by Mr. Alajmi on December 30, 2015, and, as a result, only learned of this with the cure notice (*id*. at 12).  Additionally, Trident argues that the government should *not* have intervened in the dispute between Trident and its local sponsor, Mr. Alajmi, and by doing so, breached the contract and caused Trident's failure to perform (*id*. at 12).

If appellant can demonstrate, as it alleges, that the government coordinated the transfer of the leased vehicles to a third party who does not have contract privity with it, then Trident's claims for breach of contract, bailment, and breach of the implied duty of good faith and fair dealing would be significantly bolstered.  However, appellant's position appears to focus on the result:  Mr. Alajmi eventually was able to retrieve the vehicles through Trident's representative, Mr. Mostafa; thus, the government must have been responsible and liable for Trident's alleged damages.  We agree with the government that appellant's allegation of breach of contract for receiving communications from Mr. Alajmi is meritless.  Appellant has not identified a contractual obligation that the government breached nor shown how the government "breached" a duty by the COR receiving a text message from Mr. Alajmi (SOF ¶ 8).  Furthermore, appellant has failed to show that the government coordinated the transfer of the vehicles or that the government knew Mr. Mostafa intended to give the vehicles to Mr. Alajmi (SOF ¶¶ 8, 10, 13, 16).  Quite the opposite.

The government reasonably informed Trident of Mr. Alajmi's claims and requested a response regarding its future performance.  After learning of Mr. Alajmi's claims, the CO promptly emailed Mr. Zvarick and Mr. Kuster and informed them that Mr. Alajmi claimed to be a partner of Trident and the registered owner of the leased vehicles but had yet to receive payment from Trident.  Consequently, he wanted the leased vehicles in Qatar returned to him.  (SOF ¶ 10)  In addition, the CO informed Trident that it could be in default if leased vehicles could not be provided throughout the entire contract term (*id*.).  Finally, the CO requested receipt of its email and for Trident to respond to the issues raised and its future performance no later the next day (*id*.).  Trident's written response to the CO's concerns was not of shock and dismay at Mr. Alajmi's claims; rather, Trident acknowledged some of Mr. Alajmi's claims:  that he was Trident's sponsor; that the leased vehicles are registered under his name; and that Trident was working behind the scenes to resolve the dispute with Mr. Alajmi (SOF ¶¶ 11, 12).  In addition, Trident stated that if the leased vehicles were retrieved, it had a plan to replace vehicles to ensure there was no service interruption under the contract (SOF ¶ 12).

21

The government's actions were reasonable and prompt once it learned of Mr. Alajmi's claims against Trident. The CO immediately emailed Trident of Mr. Alajmi's allegations, reminded them of their contractual obligations, and requested a detailed response regarding its future performance.

Appellant relies heavily on email exchanges of the CO's support staff who received communications from Mr. Alajmi as "evidence" that the government coordinated the transfer of vehicles to Mr. Alajmi:

> From December 24, 2015 to December 30, 2015, the Government communicated directly with Mr. Alajmi and coordinated the transfer of the vehicles to Mr. Alajmi without ever speaking to Trident's Contract Managers in total disregard for the Contract.
>
> . . .
>
> The Government knew exactly what Mr. Alajmi's intentions were with respect to Trident's vehicles, but failed to exercise ordinary care by conducting due diligence into Mr. Alajmi's false claims of entitlement. From at least December 20, 2015 to December 30, 2015, the COR was in contact with Mr. Alajmi through text messages.

(App. cross-mot. and resp. at 14, 21)

The text messages that appellant refers to are one-sided communications from Mr. Alajmi to the CO's support staff (SOF ¶¶ 14-15, 17). In addition, the CO instructed her support staff to refrain from communicating with Mr. Alajmi. The CO emailed Mr. Alajmi stating that the government could not provide him any information or assistance since the government lacks privity of contract with him (SOF ¶¶ 15-16, 33). Appellant has failed to cite any evidence in the record that the government communicated or coordinated with Mr. Alajmi regarding the transfer of the lease vehicles. The government's actions were prudent and reasonable under the circumstances. Appellant has failed to carry its burden of element (3) to show how the government breached a contractual duty. *Lockheed Martin Integrated Sys., Inc.*, 17-1 BCA ¶ 36,597 at 178,284. Accordingly, the government's motion for summary judgment on this issue is granted, and appellant's cross-motion for summary judgment on this issue is denied.

22

*C. Breach of Contract (Failure to Return the Vehicles)*

We now turn to whether the government breached the contract by allowing Trident's representative, Mr. Mostafa, to retrieve the leased vehicles on December 30, 2015. A breach of contract is simply the non-performance of a contractual duty. *Kasarsky v. Merit Sys. Prot. Bd.*, 296 F.3d 1331, 1336 (Fed. Cir. 2002). The government argues that it did nothing more than wait to see what transpired between Trident and its sponsor regarding Mr. Alajmi's claims (gov't mot. at 26; gov't reply at 23; SOF ¶¶ 13, 36). Appellant alleges that "the Government fell for a scam perpetrated by Mr. Alajmi," "the Government failed to conduct any sort of inquiry into the validity of Mr. Alajmi's claims (that were fraudulent)" and that the "Government asked no questions of Mr. Alajmi but turned over Trident's vehicles to him" (app. cross-mot. and resp. at 10, 14). Now, we turn to the issue of how the leased vehicles were removed from the Qatar base, Camp As Sayliyah.

*i. Appellant has failed to demonstrate how the government violated Qatari law and regulations*

Appellant alleges that the "Government gave away the vehicles to an unknown third party without a shred of legal entitlement to the vehicles under Qatari law or with any repossession rights under Qatari law" (app. cross-mot. and resp. at 12). Though our rules empower us to attempt to determine foreign law, we are not obligated to do so. *Agility Logistics Servs. Co. KSC*, ASBCA No. 57415 *et al.*, 17-1 BCA ¶ 36,658 at 178,518; *Weigel Hochdrucktechnik GmbH & Co. KG*, ASBCA No. 57207, 12-1 BCA ¶ 34,975 at 171,924. Instead, we may require the party relying upon foreign law to demonstrate its application in a particular matter. *Sungwoo E&C Co.*, ASBCA No. 61144 *et al.*, 22-1 BCA ¶ 38,125 at 185,208; *Agility Logistics Servs. Co. KSC*, 17-1 BCA ¶ 36,658 at 178,518. Foreign laws can be demonstrated through written or oral expert testimony and extracts from foreign legal materials. *Rosinka Joint Venture*, ASBCA No. 48143, 97-1 BCA ¶ 28,653 at 143,139. Given that appellant is asserting the government breached the contract and gave away the vehicles to a third party without legal rights under Qatari law, it is appellant's burden to show how "an unknown third party," Mr. Alajmi, and the government violated repossession rights under Qatari law. Appellant seems uncertain in the application of Qatari law on the issue of the retrieval of the leased vehicles, later equivocating whether the government "likely violate[d] Qatari law" (app. cross-mot. and resp. at 14). Appellant has not cited any Qatari law, statute, or case law for its proposition. Accordingly, appellant has not shown who, if anyone, under Qatari law violated its rights in the leased vehicles retrieved by Mr. Mostafa. The Board lacks sufficient expertise to answer that question on its own. *See Agility Logistics Servs. Co. KSC*, 17-1 BCA ¶ 36,658 at 178,518; *Weigel Hochdrucktechnik Gmbh & Co. KG*, 12-1 BCA ¶ 34,975 at 171,924.

23

*ii. The government did not breach the contract by allowing Trident's representative, Mr. Mostafa, to retrieve the leased vehicles*

Next, appellant argues that the government violated the vehicle return conditions outlined in the contract and thus breached the contract and is liable for the leased vehicles being indirectly transferred to Mr. Alajmi (amended compl. dtd. September 30, 2020, ¶¶ 13, 14; app. cross-mot. and resp. at 2-3, 13, 24-25). Appellant argues only Trident's Contract Manager, Mr. Kuster, or his alternate, Mr. Zvarick, were allowed to sign off for the return of the vehicles, citing contract paragraph 4.6.1 (app. cross-mot. and resp. at 13). "When the Government gave Trident's vehicles to Mr. Alajmi without the involvement of Trident's Contract Managers, the Government knew it was working beyond its contractual limits and without Trident's knowledge or consent, thereby changing the Contract and breaching paragraph 4.6.1 of the Contract" (*id*. at 18). Appellant argues that the retrieval of the leased vehicles by Mr. Alajmi through Trident's agent, Mr. Mostafa, was through the government's coordination with both Mr. Alajmi and Mr. Mostafa, "Mr. Mustafa was there at the Army's request after the Army unilaterally coordinated with Mr. Alajmi without Trident's knowledge or consent. Mr. Mustafa was merely a 'vehicle' that transferred the vehicles to Mr. Alajmi as the Army knew Mr. Mustafa had base access, whereas Mr. Alajmi did not." (*Id.* at 15)

Trident's financial issues with a third party placed the government in a difficult position. As a result, Trident asks us to find that the government breached its contract when it allowed Trident's Qatar representative, Mr. Mostafa, to sign the vehicle inspection reports and to retrieve the vehicles from Camp As Sayliyah. What was the government supposed to do in this situation? Not allow Trident's only representative who had authorized access to Camp As Sayliyah to perform vehicle inspections, document inspection reports, and retrieve the vehicles (as permitted under the contract)? Trident's position is not legally tenable.

*Reliance Upon the PWS*

Appellant's argument that *only* its Contract Manager, Mr. Kuster, or his alternate, Mr. Zvarick, were allowed to sign off for vehicle returns. Appellant's reliance on PWS "paragraph 4.6.1's requirement that the Contract Manager sign off on vehicle returns," and Mr. Mostafa signing the joint inspection sheets on December 30, 2015, resulted in the government changing the contract without Trident's agreement is misplaced (*id*. at 13). The PWS is clear that the "contractor or contractor's representative" can perform the joint vehicle inspection (SOF ¶ 45). Mr. Mostafa was Trident's "representative" having entry access to Camp As Sayliyah and performed vehicle retrieval and inspection duties consistent with his previous duties on the contract. Accordingly, we decline to adopt appellant's narrow interpretation of PWS paragraphs 4.6 and 4.6.1.

In addition, the contract is clear that Trident indemnified the government for the wrongful actions of its representatives:

> The U.S. Government shall *not be responsible for loss of* or damage to, *leased vehicles* resulting from (1) normal wear and tear, or (2) negligence of the Contractor, its agents, or employees. *The Contractor shall be liable for, and shall indemnify and hold harmless the U.S. Government against*, all actions . . . resulting from the fault, negligence, or <u>wrongful act</u> or omission <u>of the Contractor, its agents or employees</u>.

(SOF ¶ 47) (emphasis added)

By its very terms, PWS ¶ 10.0 Liability and Insurance clause covers the type of "loss": the "wrongful act" of Trident's representative who coordinated with a third party to remove the leased vehicles from Camp As Sayliyah. The U.S. government cannot be held liable for the wrongful acts of the contractor's representatives. The plain language of the clause and case law support this conclusion. *See also Kellogg Brown & Root Servs., Inc.*, ASBCA Nos. 59357, 59358, 15-1 BCA ¶ 36,071 at 176,144 (The Board interpreting a clause stating, "'caused by willful misconduct or lack of good faith' of the contractor."; the Board read the indemnification clause consistent the with its plain terms); *Tokai Transp. Co.*, ASBCA No. 5063, 60-2 BCA ¶ 2,666 at 13,309 (Liability clause reading, "The Contractor shall be liable to, and shall indemnify, the Government for any and all losses . . . when such loss or damage is caused in whole or in part by the wrongful act or omissions, or negligence of the Contractor, its agents, servants, or employees. . . ." The Board concluding that "under the terms of the contract it became the clear responsibility of the appellant to protect the Government from loss of the cargo by any *wrongful act* by agents or employees and to indemnify the Government for such loss." (*id*. at 13,309).

*Mr. Mostafa had at least Apparent Authority to Retrieve the Vehicles*

Trident states that Mr. Mostafa "was a mere valet who moved vehicles from place A to place B" and lacked "actual nor apparent authority to transfer Trident's vehicles to Mr. Alajmi" (app. cross-mot. and resp. at 16). "For Mr. Mustafa to have actual authority to dispose of the vehicles would have required Trident to manifest its intent to delegate such authority" (*id*.). Trident argues that the government did not have a reasonable belief that Mr. Mostafa had apparent authority to take the vehicles and give them to Mr. Alajmi, citing RESTATEMENT (THIRD) OF AGENCY § 3.01 ("Creation of Actual Authority"); *United States v. Great Am. Ins. Co. of New York*, 738 F.3d 1320, 1333-36 (Fed. Cir. 2013). Trident argues that "[t]he third party's belief cannot be based only on the agent's actions or conduct" citing *U.S. v. Ziegler Bolt &*

*Parts Co.*, 111 F.3d 878, 881-82 (Fed. Cir. 1997). (App. cross-mot. and resp. at 16). Trident points to the government's reliance on Mr. Mostafa's prior vehicle transfers "[i]n an attempt to justify its unauthorized actions . . . . [h]owever, prior transfers were routine involving vehicles being exchanged for service and not involving final inspection or otherwise removing the vehicles from the Contract" (*id*. at 17). Trident argues that it should not be held accountable for the leased vehicles transferred to Mr. Alajmi through Mr. Mostafa since the government knew of Mr. Alajmi's intentions, the government should have communicated this information to Trident.

We note that the doctrine of apparent authority, although not applicable to the government, can be applied to contractors. *Peter Bauwens Bauunternehmung GmbH & Co. KG*, ASBCA No. 44679, 98-1 BCA ¶ 29,551 at 146,497, *aff'd*, 194 F.3d 1338 (Fed. Cir. 1999). Apparent authority is determined by looking at *the conduct of the principal* to assess whether the principal created *a reasonable belief* that the actor was authorized by the principal in the manner relied on. *Am. Anchor & Chain Corp. v. United States*, 331 F.2d 860, 861 (Ct. Cl. 1964) (Apparent authority may be "created by written or spoken words or other conduct of the principal which, if reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.").

Trident argues that there can be no exercise of apparent authority if the principal does not somehow convey its consent for the signing of the vehicle inspection reports and that it cannot do so if it is unaware of Mr. Mostafa's activity (app. cross-mot. and resp. at 17). However, the principal need not be conscious of every action by the person acting with apparent authority to convey his consent for it; rather, it is enough that the principal acquiesces in actions that imply that the actor possessed the level of authority necessary to bind the company in the way he undertook to. *Horton Constr. Co.*, ASBCA No. 61085, 20-1 BCA ¶ 37,622 at 182,651-52 (The Board finding apparent authority even when the "government never demonstrated that [employee] had ever signed a final release before, supposedly refuting his apparent authority to do so, is similarly misguided. . . . [Employee] presented as having apparent authority to do all things related to the contract's administration without reservation. Nothing about his behavior or appellant's acquiescence gave the government cause to doubt that his authority should not extend to executing the final release.") *Compare Seven Seas Shipchandlers, LLC*, ASBCA No. 57875 *et al.*, 15-1 BCA ¶ 35,908 at 175,530-31 (In a dispute dealing with government payment in Afghan cash to contractor's employee, intended as payment on contractor's contracts, but employee disappeared with the money. The Board found no apparent authority when there was no evidence that anyone in the government formed a belief that employee possessed the authority to collect cash for contractor. The CO was silent about his perception of employee's authority, at least another government official knew that employee was not among those authorized to accept cash for contractor, and government was not aware

employee had performed cash collection in the past, and employee had forged contractor's signatures on payment vouchers.)

Through Trident's actions, this authority to perform joint vehicle inspections, sign the joint inspection reports, and retrieve the vehicles, was delegated to its Qatar representative, Mr. Mostafa. Trident's contract managers did not obtain badges to access Camp As Sayliyah. They did not have any of its contract managers present in Qatar to conduct the joint inspections under the Contract. Mr. Mostafa was Trident's only Qatar representative (SOF ¶¶ 6, 18). The PWS is clear that a "contractor's representative" can perform the joint inspection and "document in writing the vehicle condition upon . . . return of the vehicles." The nature of the contract required Trident to access Camp As Sayliyah to deliver vehicles and retrieve vehicles for regular maintenance. (SOF ¶¶ 1, 44-46) Trident was allowed to retrieve and replace vehicles "at any time" to conduct scheduled/unscheduled maintenance (SOF ¶ 46). Trident elected Mr. Mostafa as its Qatar representative and submitted his information for base access. Once Mr. Mostafa's background check was completed, he was provided a base access badge to enter the base. (SOF ¶¶ 18, 32) As Trident's representative, Mr. Mostafa's role at Camp As Sayliyah included dropping off and retrieving vehicles, vehicle maintenance, vehicle registration, invoicing, addressing issues from traffic accidents and traffic fines, and coordinating requests for equitable adjustment (SOF ¶ 32). Appellant has taken various positions in the role of its representative, Mr. Mostafa, during this dispute. The cited record and appellant's admissions in its March 1, 2019, claim do not support appellant's purported role for Mr. Mostafa asserted in its cross-motion that Mr. Mostafa was a "mere valet" who had no authority as its representative (app. cross-mot. and resp. at 16-17). Appellant's March 1, 2019, claim admits that Mr. Mostafa's role as its Qatar representative included "picking-up / dropping-off serviced vehicles during the Contract's performance" (gov't mot., ex. G-2 at 2).

Mr. Mostafa's actions of performing a joint inspection and documenting the vehicles' condition on December 30, 2015, were consistent with his previous duties as Trident's representative under the contract. *See also* (SOF ¶¶ 6, 7); *Horton Constr. Co.*, 20-1 BCA ¶ 37,622. Trident's actions established apparent authority of Mr. Mostafa to sign vehicle inspection reports by not obtaining access to Camp As Sayliyah for its contract managers. In addition, its contract managers were not badged to enter Camp As Sayliyah and located thousands of miles from Qatar (*see* SOF ¶ 12). We are guided by Trident's actions and its utilization of its representative, Mr. Mostafa, throughout contract performance. *See Info. Sys. & Networks Corp.*, 148 Fed. Cl. at 368–69 ("If the principal places a person in a position or office with specific functions or responsibilities, from which third parties will infer that the principal assents to acts by the person requisite to fulfilling the specific functions or responsibilities, the principal has manifested such assent to third parties."); *Great Am. Ins. Co. of New York*, 738 F.3d at 1335 ("[T]he pattern of agents exceeding their

authority with no objection from [the company] would lead a reasonable person in the government's position to believe that such acts were authorized.").

*The Adverse Interest Exception Does Not Apply Since Appellant Benefited from Mr. Mostafa's Actions*

Appellant cites *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1249 (Fed. Cir. 2007) for the proposition that "[a] principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes" (app. cross-mot. and resp. at 17). Thus, Trident argues that Mr. Mostafa's actions as Trident's representative of retrieving the vehicles on December 30, 2015, and subsequently transferring them to Mr. Alajmi, cannot be attributed to it (*id*.).

The mere fact that the agent's primary interests are not coincident with those of the principal, however, is insufficient to invoke the adverse interest exception. *Long Island Sav. Bank*, 503 F.3d at 1250. In *Long Island*, the agent served as a bank's CEO and a senior member of a law firm specializing in banking and mortgages. In violation of banking law, the bank's CEO funneled legal work associated with mortgage closings to his law firm. The bank's CEO derived financial benefits from legal fees generated as he was also a partner with the law firm performing the legal services. The court found that the record failed to show that the bank's CEO entirely abandoned the bank's interests for his own. The court found the adverse interest exception did not apply to the principal, the bank, as it would have needed to pay for outside counsel for representation in foreclosure proceedings and derived a benefit of competent legal assistance associated with mortgage closing services on behalf of the bank. *Long Island Sav. Bank*, 503 F.3d at 1250.

Even if *Long Island* applied, Mr. Mostafa's retrieval of the leased vehicles on behalf of Mr. Alajmi was not "entirely" in his interests without even incidental benefit to the principal, Trident. The cracks in the financial relationship between Trident and its Qatar sponsor, Mr. Alajmi, appeared early on during contract performance with Mr. Kuster threatening to pull the leased vehicles from the government, "[i]f we want to pull our vehicles from the contract due to Ajmi [sic] situation, I need to work that out" (gov't mot., ex. G-5 at 00000058). Moreover, after Mr. Mostafa retrieved the vehicles, Mr. Zvarick emailed Mr. Alajmi stated that he had given him "full power of attorney" and that he should "make every effort to sell the vehicles as soon as possible" "to settle as much of the debt as possible" (SOF ¶¶ 9, 21). Thus, the retrieval of the leased vehicles by Trident's representative benefited Trident in paying down its mounting debts for failure to pay the vehicles' leases. *See Long Island Sav. Bank*, 503 F.3d at1250; *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1370 (Fed. Cir. 2013) (principal received the benefit of subcontractor's services, although

the principal's agents were receiving kickbacks from the subcontractor). Accordingly, the adverse interest exception cited by appellant does not apply.

*Trident Ratified Mr. Mostafa's Actions*

Ratification is the affirmance by a person of a prior act supposedly done on his behalf by another, but which was not authorized. *Northrop Grumman Sys. Corp. Space Sys. Div.*, 10-2 BCA ¶ 34,517 at 170,238. "Ratification requires knowledge of material facts involving the unauthorized act and approval of the activity by one with authority." *Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1347 (Fed. Cir. 2007) (citing *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433-34 (Fed. Cir. 1998)). The essence of ratification is that the prior unauthorized act is treated as if it had been authorized by the "principal" at the outset. *See* RESTATEMENT (THIRD) OF Agency §§ 4.01, 4.02 (2006).

Mr. Zvarick's January 7, 2016, email ratified the actions of Trident's representative, Mr. Mostafa, who retrieved the vehicles from Camp As Sayliyah. Mr. Zvarick was aware by the cure notice that the five leased vehicles were retrieved by Mr. Mostafa on December 30, 2015 and had yet to be replaced. The next day, Mr. Zvarick emailed Mr. Alajmi on January 7, 2016, to "make every effort to sell the vehicles as soon as possible" (SOF ¶ 21). The combination of the January 6 cure notice and Mr. Zvarick's January 7 email shows Trident knew Mr. Mostafa removed the leased vehicles from Camp As Sayliyah; and Mr. Zvarick, after the fact, approved his actions by encouraging Mr. Alajmi to sell the vehicles to recoup his financial losses (SOF ¶¶ 20-21). Ratification is all or nothing. A principal cannot ratify only the beneficial parts of an agent's conduct while refusing to affirm the rest. RESTATEMENT (THIRD) OF AGENCY § 4.07 (2006). "Ratification is effective even when the third party knew that the agent lacked authority to bind the principal but nonetheless dealt with the agent" (*id.* at § 4.01 cmt. b). Accordingly, Mr. Zvarick's January 7 email to Mr. Alajmi was a ratification that retroactively created the effects of actual authority for Mr. Mostafa's actions to remove the leased vehicles from Camp As Sayliyah on December 30, 2015.[8] RESTATEMENT (THIRD) OF AGENCY §§ 4.01, 4.02 (2006).

Once the fact of Trident's non-delivery is established, the burden is on the appellant to show that its failure to perform was beyond its control and without its

---

[8] A principal can be held "accountable under an unauthorized agreement if the principal knowingly receives or retains the benefits of the agreement, even if the principal expresses disapproval of such agreement or some portion thereof. ('A person may not, by ratifying an act, obtain its economic benefits without bearing the legal consequences that accompany the act.')." *Weeks v. United States*, 144 Fed. Cl. 34, 50 (2019) (citing RESTATEMENT (THIRD) OF AGENCY § 4.07 cmt. b) (internal citations omitted)).

fault or negligence. *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996), cert. denied, 519 U.S. 992 (1996); *Double B Enters., Inc.*, ASBCA Nos. 52010, 52192, 01-1 BCA ¶ 31,396 at 155,110. Trident has failed to show that its non-delivery or returning leased vehicles to Camp As Sayliyah was excusable.

We hold that the government did not breach the contract for failure to return the vehicles as 1) PWS paragraphs ¶ 4.6 and ¶ 4.6.1 allowed the joint vehicle inspection and signing document reports by the "contractor *or* the contractor's representative"; 2) PWS paragraph ¶ 10.0 indemnifies the government for actions of the contractor or its employees; 3) Mr. Mostafa had apparent authority to perform joint vehicle inspections, sign the inspection reports, and remove the vehicles from Camp As Sayliyah based on past contract performance; 4) the adverse interest exception does not apply since Trident benefited from its encouragement of Mr. Alajmi to sell the vehicles to recoup any financial losses for its failure to pay the leases;  and, 5) Trident ratified Mr. Mostafa's actions. Accordingly, appellant has failed to carry its burden of element (3) to show how the government breached a contractual duty. *Lockheed Martin Integrated Sys., Inc.*, 17-1 BCA ¶ 36,597 at 178,284. The government's motion for summary judgment on this issue is granted, and appellant's cross-motion for summary judgment on this issue is denied.

### D. Breach of Bailment Agreement

When the government rents property from a contractor, a bailment for the parties' mutual benefit is created. *Mohammad Darwish Ghabban Est.*, ASBCA No. 51994, 00-2 BCA ¶ 31,114 at 153,671; *Analog Precision, Inc.,* ASBCA Nos. 31277, 32877, 87-2 BCA ¶ 19,804 at 100,170; *Innovations Hawaii*, ASBCA Nos. 30619, 30627, 87-1 BCA ¶ 19,376 at 97,967. Returning bailed property in a state unfit for service may give rise to a claim for damages. *Mohammad Darwish*, 00-2 BCA ¶ 31,114 at 153,671-72; *Manufactured Hous. Servs., Inc.*, ASBCA No. 41269 *et al.*, 92-3 BCA ¶ 25,159 at 125,407.

Appellant argues that Trident leased the vehicles to the government, and the government did not exercise reasonable and ordinary care when it "voluntarily transferred the vehicles to a third party, Mr. Alajmi, knowing that Mr. Alajmi intended to deprive Trident of those vehicles" (amended compl. dtd. September 30, 2020 at 12; *see also* app. cross-mot. and resp. at 25).

The law imposes upon the bailee the duty to protect the property by exercising ordinary care and, on the termination of a bailment, to redeliver the identical thing bailed in substantially the same condition, ordinary wear and tear excepted, or account for it in accordance with the contract. *Mohammad Darwish Ghabban Est.*, 00-2 BCA ¶ 31,114 at 153,671-72. Where there is a written contract, the rights and obligations of the parties are determined by the contract's provisions. The bailee by express

agreement or by fair implication in the contract can assume the risk of loss of the bailed item without regard to fault. *Sun Printing & Publ'g Ass'n v. Moore*, 183 U.S. 642 (1902); *H.N. Bailey & Assocs.*, ASBCA No. 29298, 87-2 BCA ¶ 19,763 at 100,004, aff'd on reconsid., 88-3 BCA ¶ 21,005.

The record does not support appellant's allegations that "the COR plotted with Mr. Alajmi to take the vehicles off Contract to Trident's detriment" (app. cross-mot. and resp. at 13). The government followed the procedures for joint inspection outlined in the PWS ¶ 4.6 (SOF ¶ 45). The government exercised ordinary care in protecting Trident's leased vehicles and redelivered the leased vehicles to Trident's representative, Mr. Mostafa. Mr. Mostafa was the only Trident representative with base access at Camp As Sayliyah. As Trident's Qatar representative, Mr. Mostafa delivered vehicles to Camp As Sayliyah, performed vehicle maintenance, invoiced, and picked up vehicles. Appellant has failed to show that the government coordinated with Mr. Alajmi the transfer of the leased vehicles or that the government knew that Mr. Alajmi would use Mr. Mostafa as a proxy to obtain the vehicles. In addition, Trident had assured the CO that it "has taken measures to provide replacement vehicles in the event he [Mr. Alajmi] continues on this path," a reassurance which the CO relied on (SOF ¶¶ 12-13).

The government's motion for summary judgment on this issue is granted, and appellant's cross-motion for summary judgment on this issue is denied.

### E. Breach Of Implied Duty Of Good Faith And Fair Dealing

Appellant argues that the government "had a duty not to interfere with Trident's performance and not to take any action that could destroy Trident's reasonable expectations regarding the benefits of the Contract." Specifically, Trident argues that the government voluntarily transferred the vehicles to a third party, Mr. Alajmi. The government did so without Trident's approval and knew Mr. Alajmi intended to deprive Trident of the vehicles. (Amended compl. dtd. September 30, 2020 at 13)

"[E]very contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981), quoted in *Alabama v. North Carolina*, 560 U.S. 330, 351 (2010). To determine whether there has been a breach of the implied duty of good faith and fair dealing, there is a focus on whether a party has acted in accordance with the purpose of the contract, has interfered with the other party's performance, or acted in such a way as to destroy the other party's reasonable expectations as to the fruits of the contract. *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014); *ECC Int'l, LLC*, ASBCA No. 58993 *et al.*, 22-1 BCA 38,073 at 184,894. Failure to fulfill that duty constitutes a breach of contract, as does failure to fulfill a duty "imposed by a promise stated in the agreement." RESTATEMENT (SECOND) OF

CONTRACTS § 235 (1981); *Metcalf Constr. Co.*, 742 F.3d at 990. The courts have long applied those principles to contracts with the federal government. *E.g., Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828 (Fed. Cir. 2010); *Malone v. United States*, 849 F.2d 1441, 1445–46 (Fed. Cir. 1988). The "implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *E.g., Precision Pine & Timber, Inc.*, 596 F.3d at 831. Although, in one sense, any "implied" duty "expands" the "express" duties, our formulation means simply that an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision. *Metcalf Constr. Co.*, 742 F.3d at 991.

As discussed at length above, appellant has:

1. Failed to show that the government transferred the leased vehicles to a third party and,

2. Failed to show that the government did not follow the joint inspection and documentation procedures in PWS ¶ 4.6, and,

3. Failed to show the government knew that Trident's representative, Mr. Mostafa, intended to transfer the vehicles to Mr. Alajmi.

Because the government had a reasonable expectation that Trident's Qatar representative, Mr. Mostafa, performed duties consistent with his performance during the contract period, the government (i) acted in accordance with the purpose of the contract in performing the vehicle inspections and signing the reports with Mr. Mostafa, (ii) the government did not interfere with Trident's performance for releasing the leased vehicles to Trident's representative, Mr. Mostafa, and (iii) the government did not destroy Trident's reasonable expectations as to the fruits of the contract.

The government's motion for summary judgment on this issue is granted, and appellant's cross-motion for summary judgment on this issue is denied.

*F. Invoices For Services Provided Before the Transfer of Vehicles*

*i. Appellant did not abandon its claim in the amount of $27,510.99 for costs associated with past-due leasing, maintenance, and traffic violations*

The government argues that the CO had concluded that "it already paid the $27,510.99" invoices and "provided proof of payment" in the COFD, and "appellant has not provided any evidence countering the government's showing payment of the

claimed invoices." Therefore, the government argues that appellant has "abandoned" this portion of its claim, and as "appellant has not disputed the government's proof of payment, the claim should be denied" (gov't mot. at 16, n.2).

Appellant's amended complaint requested that "the Government pay Trident for all invoices due under the Contract" in the amount of $27,510.99 for costs associated with past due leasing, maintenance, and traffic violations for invoices under Task Orders 006-008 (amended compl. dtd. September 30, 2020, at 15). Accordingly, we conclude that appellant did not abandon this portion of its claim.

### ii. Material facts are in dispute concerning the alleged non-payment for services provided before the transfer of vehicles

The invoiced documents to which the government refers do not show "payment" for all three task orders. For Task Order 0006, for example, the government refers to 10 invoices that the payment official has noted are "blocked for payment" or the traffic violations and tolls CLINs were excluded and not billed (SOF ¶ 28: "blocked for payment" invoices 2, 4, 5; excluded CLINS, invoices 16-20). Invoices for Task Orders 0007 and 0008 have similar issues of not capturing the traffic violations and tolls amount in the total invoice amount (SOF ¶ 28, invoices 6, 8-12, 14-15).

We conclude that material facts are in dispute regarding the invoices for Task Orders 006, 0007, and 0008. Without expert testimony regarding the WAWF invoices, we cannot ascertain whether the traffic violations and tolls CLIN 0012AA were included in the processed invoices and whether the term "paid" means the invoice was approved to be paid or whether Trident was paid money. For the foregoing reasons, both the government's motion and Trident's cross-motion for summary judgment on damages for services provided before the transfer of vehicles are denied.

### G. The Government's Termination for Cause

A termination for default is a drastic sanction that should be imposed (or sustained) only for good grounds and on solid evidence. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969) (citation omitted)). Though this is an appeal brought by Trident, because a termination for default is essentially a government claim, the government bears the initial burden of proving "by a preponderance of the evidence that a termination for default was justified." *Keystone Cap. Servs.*, ASBCA No. 56565, 09-1 BCA ¶ 34,130 at 168,753 (citing *Lisbon Contractors*, 828 F.2d at 765). "If the government establishes a prima facie case justifying the termination, the burden shifts to the contractor to prove the default was excusable." *Truckla Servs., Inc.*, ASBCA Nos. 57564, 57752, 17-1 BCA ¶ 36,638

at 178,445 (citing *ADT Constr. Grp., Inc.*, ASBCA No. 55358, 13 BCA ¶ 35,307 at 173,312).

### i. *The government established a prima facie justification for the termination*

The termination in this appeal is governed by FAR 52.212-4(m), CONTRACT TERMS AND CONDITIONS — COMMERCIAL ITEMS (JULY 2013) (SOF ¶¶ 20, 40). FAR 52.212-4(m) allows the government to terminate for cause for any one of three reasons: (1) default by the contractor; or (2) failure of the contractor to comply with contract terms and conditions; or (3) failure to provide the government, upon request, with adequate assurances of future performance. The government has established a prima facie basis to terminate on all three grounds.

Task Orders 0006, 0007, and 0008 required Trident to provide a 12-month lease of five non-tactical vehicles in Qatar (SOF ¶¶ 2-5). However, it is undisputed, and the cited record shows that Trident's representative, Mr. Mostafa, retrieved the five vehicles on December 30, 2015. In addition, Trident failed to timely respond to the CO's cure notice and provide replacement vehicles as required by the contract (SOF ¶¶ 1-5, 18-20, 23, 44). After a week without vehicles, pursuant to PWS paragraph ¶ 4.3, the CO determined Trident was not in compliance for failure to supply vehicles under the task orders and issued a cure notice dated January 6, 2016, for Trident to provide replacement vehicles within 10 days (SOF ¶¶ 20, 44). Trident failed to provide the CO with adequate assurances of future performance within the 10-day deadline. Trident did not timely respond to the cure notice, and on January 20, 2016, Mr. Kuster responded that "Trident is unable to provide vehicles . . . ." (SOF ¶ 23). The government has demonstrated by a preponderance of the evidence that its termination for cause was justified. The burden now shifts to Trident to prove its default was excusable.

### ii. *Appellant has failed to show its default was excusable*

The nexus of appellant's argument is that government's prior material breaches directly caused Trident's lack of performance, namely, the transfer of the leased vehicles indirectly to Mr. Alajmi (app. cross-mot. and resp. at 27-28). Thus, appellant argues that its non-performance is excused, and the termination is improper (app. combined memorandum of law and opp. to gov't summary judgment mot. dtd. April 15, 2022 at 11-12).

Paragraph (f) of FAR 52.212-4, Excusable delays, postulates that such delays must be "beyond the reasonable control of [Trident] and without its fault or negligence," and provides examples. For reasons already explained at length and exhausted above, appellant has failed to show that the government first materially

breached the contract, acted in bad faith, or was responsible for Trident's failure to perform under the contract conditions. Appellant's reasoning that Mr. Alajmi ultimately obtained the leased vehicles, the government must have been directly involved and responsible is faulty and unsupported by the cited record. Briefly, appellant has failed to show that the government communicated and/or coordinated with a third party, Mr. Alajmi, to transfer the leased vehicles. Appellant's citation to emails and texts messages from Mr. Alajmi to government personnel in an attempt to obtain information or "coordinate" retrieval of the leased vehicles is insufficient to show that the government coordinated with Mr. Alajmi (SOF ¶¶ 8-9, 14-16, 33, 36). The cited records demonstrate that the government was uncommunicative with Mr. Alajmi (not responding to Mr. Alajmi's text messages and emails) and did not provide him with any assistance (refusing to provide Mr. Alajmi any information after repeated requests; the CO correctly refused to communicate or provide any assistance with Mr. Alajmi as he lacked privity of contract) (SOF ¶¶ 8, 9, 14-16, 33, 36). In addition, appellant has not shown the government knew or should have known that Trident's representative, Mr. Mostafa, would obtain the leased vehicles on behalf of Mr. Alajmi. Accordingly, appellant failed to show its default was excusable without fault or negligence.

The government's motion for summary judgment on this issue is granted, and appellant's cross-motion for summary judgment on this issue is denied.

### H. Contractor Performance Assessment Reporting System (CPARS)

#### i. The Board has jurisdiction over appellant's CPARS claim, and appellant did not abandon it

The government argues that "the Board does not have the jurisdiction to grant specific performance such as revising the CPARS assessment" citing *Versar, Inc.*, ASBCA No. 56857, 10-1 BCA ¶ 34,437 at 169,959 (gov't mot. at 16, n.2). In the alternative, the government argues that appellant's CPARS claim should be dismissed since appellant has abandoned it (gov't mot. at 16, n.2).

The government is correct that we do not possess jurisdiction to order an agency to revise a CPARS rating. *PROTEC GmbH*, ASBCA No. 61161 *et al.*, 18-1 BCA ¶ 37,064 at 180,420. However, we can assess whether the contracting officer reasonably rendered the disputed performance rating or was arbitrary and capricious in assigning an inaccurate and unfair performance evaluation and abused her discretion. *Versar, Inc.*, 10-1 BCA ¶ 34,437 at 169,959; *MicroTechnologies, LLC*, ASBCA Nos. 59911, 59912, 16-1 BCA ¶ 36,354 at 177,236. Thus, we may remand a matter to require a contracting officer to follow applicable regulations and provide appellant with a fair and accurate performance evaluation. *MicroTechnologies, LLC*, ASBCA

Nos. 59911, 59912, 15-1 BCA ¶ 36,125 at 176,348; *Colonna's Shipyard, Inc.*, ASBCA No. 56940, 10-2 BCA 34,494 at 170,139-40; *Versar, Inc.*, 10-1 BCA 34,437 at 169,959.

We view appellant's CPARS claim as making one central assertion, that the government acted arbitrarily and capriciously, or in "bad faith," when it evaluated appellant's performance as being "unsatisfactory." (*See* SOF ¶ 29). Appellant's claim appears to challenge the CO's CPARS assessment as being arbitrary and capricious in assigning poor performance evaluation, which, Trident alleges, was a situation created by the government: requesting "a new CPAR assessment" because "[t]he Final Report is also on its face unreasonable because the analysis is incorrect, self-serving and completely backwards" and alleges that the government "fail[ed] to perform factual and/or legal due diligence" in the CPARS report (gov't mot., ex. G-2 at 9, 13). Here, by seeking that the Board overturn the COFD, which included its decision on Trident's CPARs claim, appellant seeks an order remanding the appeal to require the CO to provide Trident with a fair and accurate performance evaluation. *See PROTEC GmbH*, 18-1 BCA ¶ 37,064 at 180,420; *Sungwoo E&C Co.*, ASBCA Nos. 61144, 61219, 19-1 BCA ¶ 37,449 at 181,976 (The Board has jurisdiction over the government's performance evaluations to determine whether they were arbitrary and capricious when the government failed to exercise contract options and the contractor alleged the government acted in bad faith.). The CPARS claim was not abandoned as appellant's amended complaint discusses at length the facts surrounding the CPARS assessment (amended compl. dtd. September 30, 2020 ¶¶ 59-61). Under the heading "Requested Relief," appellant requested that the Board "[o]verturn the contracting officer's Final Decision" and "[a]ward Trident any other relief that the Board deems appropriate" (*id*. at 15, ¶¶ g, n).

Therefore, we possess jurisdiction over Trident's CPARS claim, and appellant did not abandon it.

*ii. The CO's CPARS rating was not arbitrary and capricious*

Trident received "unsatisfactory" ratings under the evaluation areas of schedule, management, and regulatory compliance (SOF ¶¶ 26, 27). The nexus of appellant's claim is that the government acted in bad faith and created the situation which resulted in the leased vehicles being "repossessed" by Mr. Alajmi (gov't mot., ex. G-2 at 8-10; amended compl. dtd. September 30, 2020 ¶¶ 60, 70, 75-76, 85, 89, 92, 94, 99). Government officials are presumed to have acted in good faith. To prove bad faith, Trident would have to show with convincing clarity a high probability that the CO responsible for the CPARS acted from "personal animus with specific intent to injure it." *Pangea, Inc.*, ASBCA Nos. 62561, 62640, 22-1 BCA ¶ 38,026 at 184,669; *see also Genome-Commc'ns*, ASBCA Nos. 57267, 57285, 11-1 BCA ¶ 34,699 at 170,889 (allegedly bad faith, retaliatory contract termination); *Defense Sys. Co.*, ASBCA No. 50918, 00-2 BCA ¶ 30,991 at 153,005 (allegedly bad faith, retaliatory cure notice)).

Appellant has failed to meet its burden of establishing that the negative evaluation was unjustified and was precipitated by the government's alleged coordination with Mr. Alajmi to retrieve the vehicles (which appellant has failed to cite support in the record for its position). The cited record does not support that the government acted in bad faith, coordinated with Mr. Alajmi to retrieve the vehicles, or that the CO acted arbitrarily and capriciously to issue a negative performance evaluation. Quite the opposite.

Once learning of the potential dispute between Mr. Alajmi and Trident, the CO immediately emailed Trident, to which Mr. Zvarick responded that they "are working diligently to resolve this dispute with Mr. Alajmi" to "insure there is no interruption of service" (SOF ¶¶ 8, 10-12). It was appellant's representative, Mr. Mostafa, who retrieved the vehicles from the government (SOF ¶¶ 18-19). Appellant paints itself as the victim in this situation that the vehicles were retrieved, and they could not obtain them back from Mr. Alajmi. Behind the scenes, after receiving the January 6, 2016, cure notice, Mr. Zvarick encouraged Mr. Alajmi to either return the vehicles to the government or "make every effort to sell the vehicles as soon as possible" (SOF ¶ 21). Mr. Zvarick's position to minimize his potential debts with Mr. Alajmi through selling the leased vehicles is opposite of Trident's contract requirements to provide the leased vehicles (SOF ¶¶ 1-5, 9, 21). Although indicating in its response to the cure notice that Trident would be able to "sort[] out any problems" with Mr. Alajmi and provide the leased vehicles to the government, Trident again reversed course and stated to the CO that it would be unable to provide the leased vehicles (SOF ¶¶ 22-23). Thus, the record reflects an unfortunate situation where Trident's Qatar sponsor was able to indirectly retrieve the leased vehicles to address an ongoing financial dispute with Trident, not the contracting officer acting in bad faith in issuing negative performance evaluations (SOF ¶¶ 9, 11-12, 18-19, 21-23). The CO's CPARS report describes in detail the late delivery of vehicles, poor communication (prolonged periods of not reaching any Trident's representatives), incorrect invoicing procedures, failure to timely respond to the cure notice, and failure to provide replacement vehicles (SOF ¶ 27).

We conclude that the CO did not abuse her discretion and did not act arbitrarily and capriciously in assigning her performance assessment of Trident.

The government's motion for summary judgment on this issue is granted, and appellant's cross-motion for summary judgment on this issue is denied.

## CONCLUSION

The government's motion for summary judgment is granted, and appellant's cross-motion for summary judgment is denied as to: Breach of Contract –Failure to Return the Vehicles, Breach of Contract – Communications Regarding Contract

Performance, Breach of Bailment Agreement, Breach Of Implied Duty Of Good Faith And Fair Dealing, Improper Termination for Cause, and the Contractor's Performance Assessment Report rating was not arbitrary and capricious. The parties' motions are denied for the costs associated with past-due leasing, maintenance, and traffic violations, as there are material facts in dispute.

Dated: May 8, 2023

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 60541, 62144, Appeals of Trident Engineering & Procurement, P.C., rendered in conformance with the Board's Charter.

Dated: May 8, 2023

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

38